**Slip Op. 04-53**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                        :
LUOYANG BEARING CORP. (GROUP),          :
ZHEJIANG MACHINERY IMPORT & EXPORT      :
CORP., and CHINA NATIONAL MACHINERY     :
IMPORT & EXPORT CORPORATION,            :
                                        :
                Plaintiffs,             :
                                        :
                and                     :
                                        :
WAFANGDIAN BEARING COMPANY, LTD.,       :
                                        :
                Plaintiff and           :
                Defendant-Intervenor,   :    Consol. Court No.
                                        :    01-00036
                v.                      :
                                        :
UNITED STATES,                          :
                                        :
                Defendant,              :
                                        :
                and                     :
                                        :
THE TIMKEN COMPANY,                     :
                                        :
                Defendant-Intervenor    :
                and Plaintiff.          :
_____:

This consolidated action concerns the claims raised by plaintiffs, Luoyang Bearing Corp. (Group) ("Luoyang"), Zhejiang Machinery Import & Export Corp. ("ZMC"), and China National Machinery Import & Export Corporation ("CMC"), and plaintiff and defendant-intervenors, Wafangdian Bearing Company, Ltd. ("Wafangdian") and The Timken Company ("Timken"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of 1998-1999 Administrative Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u> ("<u>Final Results</u>"), 66 Fed. Reg. 1,953 (Jan. 10, 2001), as amended by <u>Amended Final Results of 1998-1999 Administrative Review and Determination To Revoke Order in Part on</u>

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Amended Final Results"), 66 Fed. Reg. 11,562 (Feb. 26, 2001).

Specifically, CMC and ZMC contend that Commerce improperly rejected a market economy price of imported steel for the production of People's Republic of China ("PRC") tapered roller bearings ("TRBs") based upon a "reason to believe or suspect" that the price was subsidized. CMC further argues that Commerce erred in: (1) holding an ex parte meeting with counsel for Timken; (2) including employer welfare and provident fund expenses in the selling, general and administrative expenses ("SG&A") ratio; and (3) adding ocean freight and insurance costs to the export price of Japanese steel to determine the surrogate value. Luoyang, Wafangdian and ZMC maintain that Commerce erred in: (1) rejecting ZMC's input value for steel bought from a PRC supplier and paid for with PRC currency; (2) disregarding actual ocean freight charges paid in market economy currency to PRC freight forwarders rather than to the exporter; and (3) using aberrational data in calculating the surrogate value for wooden cases and the steel used to make rollers.

Timken contends that: (1) Commerce improperly applied the PRC rate to all Premier Bearing & Equipment Ltd. ("Premier") United States sales; (2) the administrative record does not support the use of other producers' factors data to calculate Premier's normal values; (3) the upward post-sale price adjustments to certain Wafangdian sales were unlawful; (4) Commerce failed to account for defective parts in calculating normal value for Wafangdian; and (5) Commerce acted contrary to law in revoking the order relating to Wafangdian imports.

**Held**: China National's 56.2 motion is denied. Luoyang's 56.2 motion is granted in part and denied in part. Timken's 56.2 motion is granted in part and denied in part. This case is remanded to Commerce to: (1)(a) further explain why the surrogate values it chose for wooden cases and the steel used to produce TRBs for Wafangdian constitute the "best available information," and (b) address the aberrational record data that Luoyang, Wafangdian and ZMC point to; and (2) conduct the separate rates analysis with respect to Premier and apply the PRC rate to all of Premier's United States sales if Commerce finds that Premier is not independent of government control.

[China National's motion is denied. Luoyang's motion is granted in part and denied in part. Timken's motion is granted in part and denied in part. Case remanded.]

Dated: May 18, 2004

Hume & Associates PC (Robert T. Hume) for Luoyang and ZMC, plaintiffs and Wafangdian, plaintiffs and defendant-intervenors.

Venable, Baetjer, Howard & Civiletti, LLP (Lindsay B. Meyer and Kristin K. Woody) for CMC, plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); of counsel: John F. Koeppen, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine and Amy A. Karpel) for Timken, defendant-intervenor and plaintiff.


**OPINION**

**TSOUCALAS, Senior Judge:** This consolidated action concerns the claims raised by plaintiffs, Luoyang Bearing Corp. (Group) ("Luoyang"), Zhejiang Machinery Import & Export Corp. ("ZMC"), and China National Machinery Import & Export Corporation ("CMC"), and plaintiff and defendant-intervenors, Wafangdian Bearing Company, Ltd. ("Wafangdian") and The Timken Company ("Timken"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of 1998-1999 Administrative Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u> ("<u>Final Results</u>"), 66 Fed. Reg.

1,953 (Jan. 10, 2001), as amended by <u>Amended Final Results of 1998-1999 Administrative Review and Determination To Revoke Order in Part on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u> ("<u>Amended Final Results</u>"), 66 Fed. Reg. 11,562 (Feb. 26, 2001).

Specifically, CMC and ZMC contend that Commerce improperly rejected a market economy price of imported steel for the production of People's Republic of China ("PRC") tapered roller bearings ("TRBs") based upon a "reason to believe" or suspect that the price was subsidized.  CMC further argues that Commerce erred in: (1) holding an <u>ex parte</u> meeting with counsel for Timken; (2) including employer welfare and provident fund expenses in the selling, general and administrative expenses ("SG&A") ratio; and (3) adding ocean freight and insurance costs to the export price of Japanese steel to determine the surrogate value.  Luoyang, Wafangdian and ZMC maintain that Commerce erred in: (1) rejecting ZMC's input value for steel bought from a PRC supplier and paid for with PRC currency; (2) disregarding actual ocean freight charges paid in market economy currency to PRC freight forwarders rather than to the exporter; and (3) using aberrational data in calculating the surrogate value for wooden cases and the steel used to make rollers.

Timken contends that: (1) Commerce improperly applied the PRC rate to all Premier Bearing & Equipment Ltd. ("Premier") United States sales; (2) the administrative record does not support the use of other producers' factors data to calculate Premier's normal values; (3) the upward post-sale price adjustments to certain Wafangdian sales were unlawful; (4) Commerce failed to account for defective parts in calculating normal value for Wafangdian; and (5) Commerce acted contrary to law in revoking the order relating to Wafangdian imports.

## BACKGROUND

This case concerns the antidumping duty order on TRBs and parts thereof, finished and unfinished ("subject merchandise"), from the PRC for the period of review covering June 1, 1998, through May 31, 1999 ("POR").[1] See Final Results, 66 Fed. Reg. at 1,953. In 1987, Commerce published an antidumping duty order on TRBs from the PRC. See Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China, 52 Fed. Reg. 22,667 (June 15, 1987).

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Commerce initiated an administrative review of the subject merchandise on July 23, 1999.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 64 Fed. Reg. 41,075 (July 29, 1999).

On July 7, 2000, Commerce published the preliminary results of the subject review.  See Preliminary Results of 1998-1999 Administrative Review, Partial Recission of Review, and Notice of Intent to Revoke Order in Part for Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Preliminary Results"), 65 Fed. Reg. 41,944.  Commerce published the Final Results on January 10, 2001.  See Final Results, 66 Fed. Reg. 1,953.  The Issues and Decision Memo[2] which accompanied the Final Results, is dated January 3, 2001.  See Final Results, 66 Fed. Reg. at 1,954.  Commerce later published the Amended Final Results on February 26, 2001.  See Amended Final Results, 66 Fed. Reg. 11,562.

## JURISDICTION

---

[2]   The full title of this document is Issues and Decision Memo for the 1998-99 Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results, compiled as an appendix to the Final Results, 66 Fed. Reg. at 11,562.  The Court, in the interest of clarity, will refer to this document as Issues & Decision Mem. and match pagination to the printed documents provided by the parties.  See e.g., Luoyang's App. 8.

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

### STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

### I.   Substantial Evidence Test

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before

it de novo.'" American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II. Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations

omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of

factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole.  See <u>Mitsubishi Heavy Indus. v. United States</u>, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

**DISCUSSION**

**I.    Commerce Properly Selected Surrogate Values for Imported Steel Used to Produce TRBs**

**A.    Background**

**1.    Statutory Background**

Commerce determines the antidumping duty margin by taking the difference between the normal value ("NV") and the United States price of the merchandise.  When merchandise is produced in a non-market economy country ("NME"), such as the PRC, there is a presumption that exports are under the control of the state. Section 1677b(c) of Title 19 of the United States Code provides that, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."  19 U.S.C. § 1677b(c)(1) (1994).  The statute, however, does not define the phrase "best available information," it only provides that, "[Commerce], in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market

economy countries that are--(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Consequently, Commerce is given broad discretion "to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994).

The antidumping duty statute authorizes, but does not mandate, that Commerce use surrogate countries to estimate the value of the factors of production ("FOP"). In legislative history, Congress provided Commerce with guidance by stating that, "[i]n valuing such [FOP], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Conf. Rep. No. 100-576, at 590 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("House Report"). The House Report further states that, "the conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time." H.R. Conf. Rep. No. 100-576, at 590-91, reprinted in 1988 U.S.C.C.A.N. at 1623-24. In addition, Commerce has promulgated regulations regarding the valuation of FOP in the NME context. The relevant regulations state that "where a factor is purchased from a market

economy supplier and paid for in a market economy currency,
[Commerce] normally will use the price paid to the market economy
supplier."  19 C.F.R. § 351.408(c)(1) (1999).

### 2.   Factual Background

In the Preliminary Results, Commerce valued the steel used to
produce the subject TRBs by using the actual import prices paid by
CMC.  In particular, Commerce noted:

> Certain producers in this review purchased steel from
> market economy suppliers and paid for the steel with
> market economy currency.  Thus, in accordance with
> [Commerce's] regulations, [Commerce] valued all
> appropriate steel inputs using the actual price reported
> for directly imported inputs from a market economy.  For
> all other steel inputs, we used a surrogate to value that
> steel.

Preliminary Results, 65 Fed. Reg. at 41,948.  Commerce later used
surrogate values to determine NV upon a determination that there
was "reason to believe or suspect" that the market economy prices
of imported steel used to produce the subject merchandise sold by
CMC and ZMC was dumped or subsidized.  See Final Results, 66 Fed.
Reg. at 1,955; see also CMC's Mem. Supp. Mot. Under R. 56.2 J.
Agency R. Action Under 28 U.S.C. § 1581(C) ("CMC's Mem.") at App.
7.  Commerce premised its "reason to believe or suspect," in part,
on the availability and use of general subsidies in the subject
industry.  See CMC's Mem. at App. 7.

### B.    Contentions of the Parties

#### 1.    CMC's Contentions

CMC argues that Commerce exceeded its statutory discretion by rejecting market economy prices paid for steel inputs in a market-based currency by NME producers to market economy suppliers.[3]  See id. at 17-18.   According to CMC, "these market-driven prices constitute the 'best available information.'"  Id. at 30.  Commerce relied on two United States countervailing duty investigations involving steel material inputs not used in the production of cups and cones.[4]  See id. at 19.  CMC argues, therefore, that Commerce is not entitled to Chevron deference in this determination because "[t]here is no statutory or regulatory provision that requires the rejection of either surrogate or actual prices based on a 'reason to believe or suspect' standard that the prices are dumped or subsidized."  Id.  Even Commerce's regulations are silent on this

---

[3]    Specifically, CMC maintains that the United States Court of Appeals for the Federal Circuit ("CAFC") held that "the cost of raw materials paid in convertible currencies to a market economy supplier provide Commerce with the most accurate approximation of the cost of producing the goods in a market economy."  CMC's Mem. at 28.  Thus, when Commerce "can determine that an NME producer's input prices are market determined[,] accuracy, fairness, and predictability are enhanced by using those prices."  Id. (quoting Lasko, 43 F.3d at 1446).

[4]    To make cups and cones, CMC and ZMC used hot-rolled steel bar that was imported from a market economy country and sold to ZMC's supplier factory, which paid for the steel in local market economy currency.  See Mot. Pls. Luoyang, Wafangdian & ZMC J. Agency R. ("Luoyang's Mot.") at 7; CMC's Mem. at 7.

issue and Commerce relied "exclusively on a statement in legislative history--which was neither enacted in the statute nor codified in the regulations--to support its novel position." See id. at 20. CMC also asserts that the relevant statute does not directly address the issue of a particular methodology that Commerce must employ to value the FOP in an NME. See id. at 21 (citing Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999)). "[W]hen there is a third country countervailing duty order ["CVD"] on a different product from the source country[,]" Commerce's regulations do not address the use of "actual price to value an input. See id. at 21. "'[T]he Court's task is to assess the reasonableness of Commerce's interpretation to allow for valuation based on the actual value of the inputs imported from a market economy.'" Id. at 21 (quoting Shakeproof Assembly Div. of Ill. Tool Works, Inc. v. United States, 24 CIT 485, 489, 102 F. Supp. 2d 486, 491 (2000)).

Since the statute is silent with respect to the issue at bar, CMC argues that Commerce should not be accorded Chevron deference. See id. Instead, the Court should analyze the validity, thoroughness, persuasiveness, formality and consistency of Commerce's decision in accordance with the test delineated in Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944). See CMC's

Mem. at 22 (citing United States v. Mead Corp., 533 U.S. 218 (2001)). CMC further contends that Commerce's analysis is not persuasive under Skidmore since Commerce expanded its statutory authority by rejecting the actual prices for two reasons. First, the "'reason to believe or suspect' language applied by [Commerce] is drawn not from the statute or regulations but from the legislative history." Id. Second, Commerce's determination is not supported by substantial evidence, but rather depends upon CVD on different products manufactured by different suppliers than those at issue in this review. See id. at 23.

CMC also argues that Commerce's decision to reject actual prices was a change in methodology that was made without sufficient notice to the affected parties or public. See id. Chevron deference, therefore, is not applicable here because Commerce's "new course was undertaken through informal rulemaking and without public deliberation." Id. at 24. Furthermore, Commerce's reliance on the term "subsidies" in the relevant legislative history is misplaced since the meaning of the term is not clearly defined. See id. at 24-25. Commerce's authority to reject actual prices is limited to situations where specific countervailing subsidies are in place, and not general subsidies on products different than those at issue. See id. CMC also argues that Commerce's proposed methodology does not promote transparency or predictability and

mandates respondents to monitor antidumping and countervailing duty decisions across an entire industry.  See id. at 25-26.

CMC distinguishes the determination that Commerce depends upon[5] in its analysis to "support the application of the 'reason to believe or suspect' standard to actual market economy import prices."  Id. at 34 (emphasis in original).  CMC also cites Tehnoimportexport, UCF Am. Inc. v. United States, 16 CIT 13, 783 F. Supp. 1401 (1992), and China National Arts and Crafts Import and Export Corp. v. United States, 15 CIT 417, 771 F. Supp. 407 (1991), to support its argument that no post-1998 case on point supports the application of the "reason to believe or suspect" standard to market economy imports. See CMC's Mem. at 33-34.  CMC contends that use of this standard to reject an actual price "is akin to speculation, since the evidence required to 'suspect' is very little," id. at 34, and that Commerce's assumption that market economy inputs were dumped or subsidized is not based on substantial evidence.  See id. at 35.

### 2.    ZMC's Contentions

ZMC supports the arguments made by CMC with respect to

---

        [5]     Specifically, Commerce relies on Final Results of Antidumping Administrative Review of Certain Helical Spring Lock Washers From The People's Republic of China, 61 Fed. Reg. 66,255, 66,257 (Dec. 17, 1996), which CMC claims concerned only the application of surrogate values.

Commerce's rejection of market economy prices paid for steel inputs. See Luoyang's Mot. at 17-19. Zhejiang adds:

> The legislative history on which Commerce relied to disregard the direct steel sales to the PRC should have been read in context. As Commerce noted, there was no countervailing duty imposed on imports of the steel by the PRC and there was no evidence that any other country, including the United States, had imposed countervailing duties on the specific steel.

Id. at 17. Thus, when Commerce avoids using prices it has a "reason to believe or suspect" may be dumped or subsidized prices, such a decision must be premised on the fact that injury to the domestic injury actually occurred. See id. at 17-18. ZMC argues that Commerce did not provide sufficient evidence to show that there was injury to the specific domestic industry, and that "if the sole evidence is . . . the existence of 'general subsidies' . . . [then this] is a standard Commerce should set forth in the form of rule-making and not a case decision." Id. at 18.

### 3.    Commerce's Contentions

Commerce argues that Chevron deference is applicable with respect to the statutory provision at issue. See Commerce's Mem. Opp'n Pls. Mot. J. Upon Agency R. ("Commerce's Mem.") at 46 (citing Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States ("Shakeproof III"), 268 F.3d 1376, 1378 (Fed. Cir.

2001)).[6]  Commerce responds to CMC and ZMC's argument regarding notice by stating that Shakeproof III and other cases "recognize[] that Commerce routinely announces through administrative determinations different interpretive reasons for accepting or rejecting a particular market-based or surrogate value."  Id. (citing Lasko, 43 F.3d at 1445 (affirming Commerce's valuation of a factor of production by use of surrogate country and actual cost values)); Baoding Yude Chem. Indus. Co., Ltd. v. United States, 25 CIT ___, 170 F. Supp. 2d 1335 (2001)).  Commerce contends that it is mandated by statute to base FOP valuation on the "best available information" and to assess antidumping margins accurately.  See Commerce's Mem. at 47 (citing Shakeproof III, 268 F.3d at 1382).

Commerce does not agree with CMC's argument that market-based prices are normally preferred by the agency's regulations since Commerce's primary goal is to use the best available information to

---

[6]     The Court agrees that this determination is afforded Chevron deference.  The CAFC in Shakeproof III recognizes that Commerce has "special expertise" and is granted "'substantial deference to its construction of pertinent statutes.'" Shakeproof III, 268 F.3d at 1381 (quoting Micron Tech., Inc. v. United States, 117 F.3d 1386, 1394 (Fed. Cir. 1997)).  Contra CMC's Reply Mem. Supp. Mot. R. 56.2 J. Agency R. Act. Under 28 U.S.C. § 1581(C) ("CMC's Reply") at 11 (stating that "[i]n light of Congress' intent that Commerce not engage in adjudicatory proceedings . . . the Court should not apply Chevron deference").  The CAFC further states that "[e]ven where Commerce has not engaged in notice-and-comment rulemaking, its statutory interpretations articulated in the course of antidumping proceedings draw Chevron deference." Shakeproof III, 268 F.3d at 1381 (citing Mead, 533 U.S. at 218).

value FOP.  See Commerce's Mem. at 47-48 (citing 19 C.F.R. §

351.408(a) & (c)(1)).  In this review, Commerce contends that it

had a viable "reason to believe or suspect" that the market economy

prices were subsidized and, accordingly, resorted to using

surrogate values.  See id. at 48.  Commerce argues that its

decision was in line with Chevron since the agency is accorded wide

discretion in the valuation of FOP.  See id. at 49.  Moreover,

Commerce states that its Issues & Decision Mem. sets forth that

> the obligatory language of the pertinent legislative
> history most likely refers to surrogate prices as opposed
> to actual market economy input prices.  However,
> Commerce's approach in this case is a permissible
> construction, read in conjunction with the legislative
> history, that gives effect to the first principle of the
> statute as set out in Shakeproof[III].  That is, Commerce
> shall avoid using prices (surrogate or market-based) that
> may be dumped or subsidized in order to use the best
> available information to value factors.

Id. at 49-50.

Commerce argues that it based its "reason to believe or

suspect" on substantial evidence as required by this Court's

relevant standard of review and that the agency's reasoning is set

forth in its Market Economy Steel Memorandum.[7]  See id. at 50-51.

---

[7]      Commerce recognizes the conflicting nature of the
evidence in its Market Economy Steel Memorandum and the Issues and
Decision Memo. Commerce adds that it was "fully cognizant that this
issue was one that had evidence to support a decision either way.
Because the record demonstrates this fact, [Commerce argues that]
this Court should not interfere with Commerce's legitimate choice
between two conflicting views, each of which is supported by
(continued...)

Commerce mentions that the "reason to believe or suspect" requirement merely required "some specific, particularized evidence, taking into account all the circumstances before the administrative decision maker at the time of the decision." Id. at 50-51.  According to Commerce, "[t]his is especially true in light of the congressional statement that Commerce need not investigate to ensure that prices are actually subsidized."  Id. at 51 (emphasis in original).

### 4.   Timken's Contentions

Timken generally agrees with Commerce that its decision to decline market prices was reasonable.  See Timken's Mem. Opp'n Mots. J. Agency R. CMC, Luoyang, Wafangdian & ZMC ("Timken's Opp'n") at 21.  Timken first argues that Chevron and not Skidmore deference applies in antidumping determinations.  See id. at 22. Second, Timken maintains that Commerce's determination to reject subsidized prices passes the Chevron reasonableness test.  See id. at 22-23.  Third, Timken contends that CMC's assertion regarding 19 C.F.R. § 351.408(c)(1) is in error because the relevant statue is silent on the issue of using prices of inputs from market sources.  See id. at 23.  "Therefore, there is no statutory 'mandate' precluding Commerce's action here."  Id. at 23.  CMC misreads the

---

(...continued)
evidence that detracts fairly from the other."  Commerce's Mem. at 53-54.

regulation's "direction" since it merely states that "'where a factor is purchased from a market economy supplier and paid for in a market economy currency, [Commerce] normally will use the price paid to the market economy supplier.'" 19 C.F.R. § 351.408(c)(1). Timken asserts that the word "normally" contemplates exceptions, so that the question becomes whether Commerce, in this particular review, reasonably invoked an exception to the rule. See id. at 23-24.

### C.    Analysis

#### 1.    Commerce's Changes of Policy or Methodology

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" Transcom, Inc. v. United States, 24 CIT 1333, 1342, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000). "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'"

Chevron, 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Id. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the Chevron regime, agency discretion to reconsider policies is inalienable. See id. at 843. Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of Chevron which assumes and approves the ability of administrative agencies to change their interpretations. See, e.g., Maier, P.E. v. United States EPA, 114 F.3d 1032, 1043 (10th Cir. 1997), J.L. v. Social Sec. Admin., 971 F.2d 260, 265 (9th Cir. 1992), Saco Defense Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450-51 (D. Me. 1985). In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."

Chevron, 467 U.S. at 844.

Moreover, "'[a]n [agency] announcement stating a change in the method . . . is not a general statement of policy.'" American Trucking Assns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)). While a policy denotes "the general principles by which a government is guided" by laws, BLACK'S LAW DICTIONARY 1178 (7th ed. 1999) (emphasis added), methodology refers only to the "mode of organizing, operating or performing something, especially to achieve [the goal of a statute]." Id. at 1005 (defining mode) (emphasis added); accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, the courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, P.E., 114 F.3d at 1043 (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology should be examined under the Chevron test and sustained if the new methodology is reasonable. See, e.g., Koyo Seiko Co., v. United States, 24 CIT

364, 374, 110 F. Supp. 2d 934, 942 (2000) (stating that the use of different methods of calculation does not mean there is a conflict with the statute). Therefore, Commerce's rejection of actual market economy prices and use of a surrogate value for bearing quality steel bar was a justifiable change of methodology so long as such change in position was reasonably supported by the record.

### 2. Commerce's Determination at Bar

The CAFC has reasoned that the purpose of 19 U.S.C. § 1677b(c)(1) and (4) "is to determine antidumping margins 'as accurately as possible.'" Shakeproof III, 268 F.3d at 1382 (quoting Lasko, 43 F.3d at 1446); see also Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1000-01 (1988) (noting that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, Inc. v United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Additionally, Commerce's "task in [an NME] investigation is to calculate what . . . [the] costs or prices would be [in the NME] if such prices or costs were determined by market forces." Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992).

The Court recognizes that the House Report concerns the selection of surrogate values to determine NV in the NME context. Neither the statute nor the House Report address the use of market value in the calculation of NV. The Court has established,

however, that "nothing in the antidumping duty statute directs Commerce to employ actual prices paid to a market economy supplier by an NME producer in NV calculations." China Nat'l Mach. Imp. & Exp. Corp. v. United States, 27 CIT ___, ___, 264 F. Supp. 2d 1229, 1236 (2003). Furthermore, in Lasko, the CAFC recognized that the purpose of the statute "is to prevent dumping, an activity defined in terms of the marketplace." 43 F.3d at 1446. Therefore, the use of suspect prices to calculate NV, even when paid to a market-economy supplier, would be contrary to Congress' intent.

The Court finds that when Commerce has reason to believe or suspect that a market-economy supplier's prices are subsidized, Commerce may reject market prices paid to the supplier in favor of surrogate prices for its calculation of NV.[8] The Court is unconvinced by CMC's argument that Commerce's regulations prefer that Commerce use actual prices paid whenever available. The Court finds that the applicable regulations do not require Commerce to use the market value over a surrogate value. The regulations state

_____

[8] The Court notes that the use of surrogate values by Commerce has been determined to be contrary to the intent of the law "'where we can determine that a[n] NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices.'" Lasko, 43 F.3d at 1446 (quoting Final Determinations of Sales at Less Than Fair Value for Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed. Reg. 55,271, 55,275 (Oct. 25, 1991) (emphasis added)). If the prices paid are not market determined, however, Commerce in pursuit of the law's intent may reject actual prices paid.

that Commerce "normally will value the factor using the price paid to the market economy supplier."  19 C.F.R. § 351.408(c)(1).  The regulation merely advises Commerce to use actual market values to calculate NV for an NME supplier in certain circumstances.  As the Court has previously stated, "while Commerce will use market values under normal circumstances, under certain circumstances Commerce may choose not to do so."   China Nat'l, 27 CIT at ___, 264 F. Supp. 2d at 1237 (noting that the regulation "merely indicates a preference for market prices"); see also Anshan Iron & Steel Co., Ltd. v. United States, 27 CIT ___, ___, 2003 Ct. Intl. Trade LEXIS 109, at *40 (CIT 2003) (stating that the language "merely suggests a particular methodology, but does not impose upon Commerce the requirement of selecting the market-economy price of a respondent's purchases to the exclusion of more appropriate values").

While the Court recognizes that surrogate country values are only an estimation of what the product's NV would have been if the NME were a market-economy country, see Rhodia, Inc. v. United States, 25 CIT ___, ___, 185 F. Supp. 2d 1343, 1351 (2001), Commerce's decision to use actual prices paid or surrogate values is predicated on which values provide a more accurate NV.  See Lasko, 43 F.3d at 1446 (noting that the purpose of the statute is to prevent dumping and that it "sets forth procedures in an effort to determine margins 'as accurately as possible'") (quoting Rhone

Poulenc, 899 F.2d at 1191). When Commerce has substantial evidence that prices paid to a market-economy supplier are not market determined, then the "use of such prices would undermine 'accuracy, fairness, and predictability,' in the calculation of margins and contravene the antidumping and countervailing duty statute . . . ." China Nat'l, 27 CIT at ___, 264 F. Supp. 2d at 1237 (quoting Lasko, 43 F.3d at 1446). The overarching principle of the statute prevents the Court from concluding "that Congress would condone the use of any value where there is 'reason to believe or suspect' that it reflects dumping or subsidies." China Nat'l, 27 CIT at ___, 264 F. Supp. 2d at 1238.

Section 1677b(c)(1) of Title 19 of the United States Code directs Commerce to use "the best available information" concerning the values for FOP from a market-economy when calculating the NV for a product exported from an NME country, such as the PRC. See China Nat'l, 27 CIT at ___, 264 F. Supp. 2d at 1234. The CAFC has reasoned that "there is much in the statute [19 U.S.C. § 1677b(c)(1) and (4)] that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko, 43 F.3d at 1443; see also Shakeproof III, 268 F.3d at 1382. The Court's role in this case is not to evaluate whether the information Commerce used was the best available, but rather whether Commerce's choice

of information is reasonable.[9] See <u>China Nat'l</u>, 27 CIT at ___, 264 F. Supp. 2d at 1236. Commerce's discretion in choosing its information is limited by the statute's ultimate goal "to construct the product's normal value as it would have been if the NME country were a market economy country." <u>Rhodia</u>, 25 CIT at ___, 185 F. Supp. 2d at 1351. While Commerce enjoys broad discretion in determining what constitutes the best information available to calculate NV, Commerce may not act arbitrarily in reaching its decision. If Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce.

The Court must determine whether Commerce had "reason to believe or suspect" that the market economy prices were distorted by subsidies. In <u>China Nat'l</u>, 27 CIT at ___, 264 F. Supp. 2d at 1239, the Court recognized that the applicable standard has no statutory definition. The Court noted, however, that "in order for reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting' the existence of certain proscribed

---

[9] The statute's silence regarding the definition of "best available information" provides Commerce with "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." <u>Timken Co. v. United States</u>, 25 CIT ___, ___, 166 F. Supp. 2d 608, 616 (2001). Furthermore, in evaluating the data, the statute does not require Commerce to follow any single approach. See <u>Luoyang Bearing Factory v. United States</u>, 26 CIT ___, ___, 240 F. Supp. 2d 1268, 1284 (2002).

behavior, taking into account the totality of the circumstances, the whole picture." Id. (quoting <u>Al Tech Specialty Steel Corp. v. United States</u>, 6 CIT 245, 247, 575 F. Supp. 1277, 1280 (1983)). While Commerce must support its determinations with "substantial, specific and objective evidence," <u>China Nat'l</u>, 27 CIT at ___, 264 F. Supp. 2d at 1240, the Court recognizes that the antidumping duty statute does not require Commerce to initiate a formal investigation. Congress did not intend for Commerce to undertake an investigation to determine whether prices were in fact subsidized. Rather, the statute and <u>House Report</u> merely require Commerce to have a "reason to believe or suspect" that prices are being subsidized. Consequently, to determine whether there is a "reason to believe or suspect" that prices are subsidized, Commerce may rely on information generally available to it to support its determination.

The Court finds that Commerce based its determination to reject the prices CMC and ZMC paid its suppliers on evidence that adequately supports its decision. Commerce's reason to believe or suspect that the supplier prices were subsidized was explained in the <u>Market Economy Steel Memo</u> where Commerce examined eleven antidumping orders or investigations and three CVD orders. Specifically, Commerce states:

> The bearing quality steel used by the PRC producers of
> TRBs is not covered by any of these orders. . . .

> Although the most recent findings do not cover the specific products [Commerce] need[s] to value, these findings may have broader implications for [the] steel [at issue] . . . . Based on the information submitted by the PRC producers who import steel from [the subject countries] . . . we discovered certain subsidies that are not company specific. For these general subsidies that were used . . . we believe it is reasonable to infer that [certain producers] would also use them.

CMC's Mem. at App. 7 (confidential information omitted). In it's

opposition memorandum, Commerce further explains that it

> considered the evidence and rejected all the [United States antidumping] orders and the oldest CVD order as a basis to believe or suspect that the market economy steel may be unfairly priced because the evidence was either not applicable to the type of steel used by CMC and ZMC or the order was not the most current information.

Commerce's Mem. at 51. Commerce focused on two CVD orders and

found that although the market economy suppliers were not covered

by the specific CVD orders, general nation-wide subsidies that were

not company or product specific were available to any subject steel

producer. See id. at 51-52. Such subsidies were significant and

"all were calculated using recent information generally

contemporaneous with the POR [at issue]." Id. at 52. The Court

finds, therefore, that Commerce made a logical inference that CMC

and ZMC suppliers may have benefitted from the generally available

subsidies.

Once Commerce presents adequate evidence to support its

"reason to believe or suspect" that prices are subsidized, a

rebuttable presumption is established that the prices paid are

distorted. <u>See</u> <u>Luoyang Bearing Factory v. United States</u>, 27 CIT
___, ___, 2003 Ct. Intl. Trade LEXIS 142 at *10 (CIT 2003). The
presumption is that the market-economy supplier benefitted from
subsidies. Based on this presumption, Commerce may choose to
discard the prices paid and use surrogate values to calculate NV.
The presumption, however, is not conclusive. The presumption
shifts the burden to the party challenging Commerce's determination
to present evidence demonstrating that its supplier did not benefit
from such subsidies.[10]

The Court finds that CMC and ZMC did not present sufficient
evidence to rebut this presumption. Both plaintiffs complain that
Commerce did not afford the parties the opportunity to submit
evidence to rebut this presumption during the review. <u>See</u> Reply
Br. Pls. Luoyang, Wafangdian & ZMC at 6-7; CMC's Mem. at 23-24.
However, the parties do not present any new evidence to rebut
Commerce's "reason to believe or suspect" in their briefs, but
rather focus on unconvincing arguments regarding what deference
Commerce should be afforded. Since no significant financial data
or other information indicating that the supplier prices were not
subsidized was brought to light, the Court can only conclude that

---

[10] Sufficient evidence that the prices paid were market-
determined, for example, would satisfy the manufacturer's burden.
Additionally, credible evidence that the supplier did not
participate in any subsidies programs would satisfy the burden.

no such evidence exists. If there was conclusive evidence to support the statements that the suppliers at issue did not benefit from subsidies, CMC and ZMC would certainly have placed such evidence on the record. Therefore, the Court affirms Commerce's determination to deviate from its decision to value the steel used to produce the subject TRBs upon actual import prices articulated in the Preliminary Results, and instead to base its FOP valuation on the "best available information" that Commerce concluded was surrogate values.

## II. Commere's Ex Parte Meeting With Counsel for Timken

### A. Contentions of the Parties

CMC argues that Commerce held an improper ex parte meeting with Timken "after the briefing and formal hearing on the matter and after the record had closed to the submission of information." CMC's Mem. at 44 (emphasis in original). CMC complains that this ex parte meeting, held on October 4, 2000, prevented the plaintiffs from participating in the discussion of "methodological issues" pertinent to the Final Results. See id. at 45-46. CMC also argues that 19 U.S.C. § 1677m(g) affords parties an "'opportunity to comment on the information obtained by'" Commerce and that the regulations "further restrict the time[]frame and manner within which interested parties may submit arguments during the course of an antidumping duty proceeding including those for consideration in

the final results of an administrative review." Id. at 47. CMC further complains that only a "truncated recordation" of the meeting was filed and that such action contradicts the agency's "goal of transparency." See id. at 47-48. Finally, CMC contends that "Timken's discussion [fails to] meet the requirements concerning the submission of information to value factors under" 19 C.F.R. § 351.408(c) because Timken improperly submitted publically available information in an untimely fashion. Id. at 48.

Commerce argues that CMC improperly relied on Kao Hsing Chang Iron & Steel Corp. v. United States, 25 CIT ___, ___, 140 F. Supp. 2d 1379 (2001), and Nippon Steel Corp. v. United States, 24 CIT 1158, 118 F. Supp. 2d 1366 (2000), rev'd on other grounds, 337 F.3d 1373 (2003), to support the argument that the agency erred in the manner in which the ex parte meeting with Timken was memorialized. Specifically, Commerce contends that the Court in Kao "required Commerce to place on the record affidavits of persons that attended an ex parte meeting with Commerce analysts and supervisors, which meeting had not been otherwise memorialized on the record." Commerce's Mem. at 54. Commerce further argues that the facts of this case are distinguishable from those in Nippon because the meeting memorandum was placed on the record immediately. "The memorandum [summarizing the meeting] was drafted the same day by a person in attendance and placed on the record." Id. at 55.

Commerce also argues that it is not mandated to place a verbatim transcript on the record, nor is it obligated to initiate a notice and comment period for an ex parte meeting. Timken generally agrees with Commerce and adds that Commerce is only required to maintain an appropriate record of the meeting, which Commerce did. See Timken's Opp'n at 29-31.

### B. Analysis

Pursuant to 19 U.S.C. § 1516a(b)(2)(A), the administrative record consists of

> (i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and

> (ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

The statute also requires Commerce to "maintain a record of any ex parte meetings between--(A) interested parties or other persons providing factual information in connection with a proceeding, and (B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding . . . ." 19 U.S.C. § 1677f(a)(3).

The record reflects that Commerce properly documented the ex parte meeting with Timken in a timely fashion. The Court agrees

with Commerce that the agency followed the letter and spirit of the applicable statute, and that in no way is Commerce required to place a verbatim account of the meeting on the record. The record properly identified the attendees, date, time and place of the meeting and summarized the matters discussed in accordance with 19 U.S.C. § 1677f(a)(3). Compare Commerce's Mem. at 54-56, with CMC's Mem. at 45-46. Commerce argues that all of the issues raised at the ex parte meeting were briefed by Timken. See Commerce's Mem. at 55. CMC, however, contends that this argument overlooks the inherent problem in that the meeting served as a second hearing on important methodological issues pertaining to the Final Results. CMC's Reply at 19-20. Nonetheless, Commerce did not act beyond its authority and CMC has not demonstrated that Commerce's ex parte meeting was improper or that CMC was denied the opportunity to meaningfully participate in this review.

### III. Commerce Properly Adjusted the Regression-Based Wage Rate To Include Employer Welfare and Provident Fund Expenses

#### A. Background

During the POR, Commerce, pursuant to 19 C.F.R. § 351.408(c)(3), used a regression-based wage rate to value labor costs. See Preliminary Results, 65 Fed. Reg. at 41,948. In the Final Results, 66 Fed. Reg. at 1,953, Commerce valued the PRC labor costs by utilizing the wage rates reported in Chapter 5 of the 1999

Yearbook of Labour Statistics ("YLS").  According to Commerce:

> [The] regulations at section 351.408(c)(3) state that "[Commerce] will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries." These same regulations also require [Commerce] to determine the "wage rate to be applied in nonmarket economy proceedings each year" and make it publicly available.  Therefore, to value the labor inputs in this review, [Commerce] applied the PRC regression-based wage rate established by [Commerce] and published by the Import Administration on its website, which was last revised in May 2000.

App. Timken's Mem. Opp'n Pls. J. Agency R. CMC, Luoyang, Wagangdian & ZMC ("Timken's App.) at Tab 15 p. 15.

## B.    Contentions of the Parties

CMC contends that Commerce erred in adjusting Chapter 5 wage rate data to account for provident funds and welfare expenses.  See CMC's Mem. at 49.  Specifically, Commerce added such expenses to the NV calculation of the surrogate SG&A expenses, which CMC argues resulted in a double count of a component of labor.  See id. at 49-50.  CMC argues that Congress "intended labor to be valued based upon production hours worked, which are appropriately reflected in the application of the unadjusted Chapter 5 wage rate data applied by" Commerce.  Id. at 50.

According to CMC, Commerce's past "practice has been to include provident fund and welfare expenses as components of total labor cost and not as part of overhead or SG&A expenses."  Id. at

51 (citing <u>Final Results of Antidumping Duty New Shipper Administrative Review of Pure Magnesium From the People's Republic of China</u>, 63 Fed. Reg. 3,085, 3,091 (Jan. 21, 1998); <u>Notice of Final Determination of Sales at Less Than Fair Value on Polyvinyl Alcohol From the People's Republic of China</u>, 61 Fed. Reg. 14,057, 14,061 (Mar. 29, 1996)). CMC adds that Timken's arguments challenging Commerce's treatment of labor in past reviews have consistently been rejected. <u>See</u> <u>id.</u> (citations omitted).

Commerce argues that substantial evidence demonstrates that the surrogate companies incurred all of the labor expenses included in Commerce's calculation. <u>See</u> Commerce's Mem. at 56. According to Commerce, the instant review differs from past reviews because current evidence shows that it "is undisputed and clear[] . . . that the provident fund and welfare expenses are a part of labor expenses incurred by the selected surrogates." <u>Id.</u> at 57. Commerce points out that the antidumping statute does not direct Commerce to use a particular method to value labor expenses and that in accordance with the evidence submitted by Timken, Commerce properly valued all of its FOP and based this valuation on record evidence. Such evidence, according to Commerce, did not exist in prior reviews. <u>See</u> <u>id.</u> at 58. Accordingly, "Commerce was justified in including these expenses in the SG&A ratio, and, thus, departing from its practice in the previous review." <u>Id.</u> Commerce

further contends that "[t]his change from the previous review is an interpretation of Commerce's regulation that should be given deference by this Court." Id. Commerce notes "[t]he expenses for provident fund and welfare incurred by the surrogate companies are different from those listed in Chapter 5 of the YLS." Id.

Timken generally argues that Commerce made the appropriate adjustments with respect to the valuation of labor and explains that the agency relied on annual reports of a certain Indian bearing producer to calculate SG&A expenses. See Timken's Opp'n at 31-32. Timken maintains that Commerce "specifically identified those labor costs in the Indian annual reports that were above and beyond mere wages . . . and added them to" SG&A expenses. Id. at 32. This methodology, according to Timken, was reasonable and logical and CMC's arguments lack merit. Timken contends that "CMC misstates the issue when it asserts that 'Commerce erred in adjusting the regression-based wage rate to include employer welfare and provident fund expenses.'" Id. at 33. Timken claims that Commerce merely adjusted SG&A expenses, "leaving the regression-based wage rates intact." Id. Moreover, with regards to the issue raised by CMC that Commerce "double counted" the expenses in question, Timken claims that Commerce "merely re-categorized the expenses to mesh the two sources of data and thereby account for all factor costs." Id.

## C.    Analysis

As a preliminary matter, the Court finds that Commerce's decision to add employer welfare and provident fund expenses to the NV calculation of the surrogate SG&A expenses was a justifiable change of methodology as long as such change in position was reasonably supported by the record.  See discussion supra Part I.C.1.

The applicable statute provides that, when dealing with imports from an NME such as the PRC, Commerce shall determine the NV of the subject merchandise based on FOP utilized in producing the merchandise and Commerce shall value the reported FOP based on the best available information regarding the values of FOP in an appropriate market economy.   See 19 U.S.C. § 1677b(c)(1). According to 19 U.S.C. § 1677b(c)(3), the FOP utilized in valuing merchandise from an NME include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." The relevant regulation provides:

> [f]or labor, [Commerce] will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries. [Commerce] will calculate the wage rate to be applied in nonmarket economy proceedings each year.  The calculation will be based on current data, and will be made available to the public.

19 C.F.R. § 351.408(c)(3).

In the case at bar, Commerce used the wage rates reported in Chapter 5 of the 1999 YLS, which were made available to the public by means of the Import Administration's website, to value the PRC labor costs. See Timken's App. at Tab 15 p. 15 (referring to the Issues & Decision Mem.) The data in Chapter 5 provides the most comprehensive wage rates since such figures include "overtime, bonuses and gratuities, holiday pay, incentive pay, pay for piecework, and cost-of-living allowances." Id. However, in this particular review, Commerce was also presented with specific and undisputed evidence that demonstrated that additional expenses were incurred by employers in the PRC. See id. at Tab 15 p. 16. Commerce, therefore, added provident and welfare fund expenses to its valuation of labor specifically because these two types of expenses are not expressly included in Chapter 5 data. See id. Commerce added such expenses in order to calculate the costs that the PRC producer would incur if its factory were located in the surrogate country, India as accurately as possible. See id. Tab 4. Since the relevant statute does not direct Commerce to use a specific method in its valuation of labor, see 19 U.S.C. § 1677b(c)(3), and given the evidence provided to Commerce by Timken, the Court upholds Commerce's valuation of labor. Commerce properly collected new evidence, analyzed it and reasonably determined that

the provident and welfare fund expenses must be added to the SG&A
ratio in order to accurately value labor.


**IV.   Commerce's Decision to Add Ocean Freight and Marine Insurance
       Expenses to Japanese Export Prices to Determine the Surrogate
       Value for Cups and Cones**

####    A.    Background

The relevant section of the statute provides that Commerce,
"in valuing factors of production . . . shall utilize, to the
extent possible, the prices or costs of factors of production in
one or more market economy countries that are--(A) at a level of
economic development comparable to that of the nonmarket economy
country, and (B) significant producers of comparable merchandise."
19 U.S.C. § 1677b(c)(4).  In its determination of values for steel
used to produce cups and cones, Commerce chose India as the primary
surrogate for China.  See Timken's App. at Tab 15 (citing the
Issues & Decision Mem. at 24-25).  Commerce then relied on export
values of relevant Japanese steel exports to ascertain comparable
Indian values, that is to determine an appropriate value of steel
in India available to Indian TRB producers.  See id.  Commerce also
adjusted data on Japanese exports to India to include ocean freight
and marine insurance costs to determine the surrogate value.  See
id.   Commerce explained that since no Indian producer could
produce Indian TRBs with steel located in Japan, ocean freight and
insurance costs must be added to determine an accurate value of

Indian steel.  See id.

### B.    Contentions of the Parties

CMC contends that Commerce's policy "suggests that the adjustment to add a freight and marine insurance expense was erroneous for two reasons.  First, this practice is inconsistent with [Commerce's past] practice . . . [and s]econd, . . . a containerized freight and insurance value . . . does not effectuate the statutory purpose of 'calculating accurate dumping margins.'" CMC's Mem. at 52-53.  CMC also argues that Commerce's adjustment was arbitrary and should not be sustained.

Luoyang argues that Commerce "did not provide parties a meaningful opportunity to comment on the adjustment for ocean freight and marine insurance."  See Mot. Luoyang's Mem. at 32. Luoyang also contends that in previous reviews, Commerce used Japanese export data as a surrogate for steel, however, Commerce did not make adjustments for additional ocean freight and insurance expenses.  See id. at 32-33.  Moreover, Luoyang argues that the record is devoid of any evidence suggesting that Commerce made any attempt to determine what most closely approximated the distance between Japan and India.  See id. at 33-34.

Commerce maintains that CMC and Luoyang's arguments are without merit.  Commerce states that it provided a reasonable

explanation for its adjustment and that its decision was not inconsistent with Commerce's practice in the last administrative review. See Commerce's Mem. at 59. Timken generally agrees that Commerce acted in accordance with law by adding "reasonable" values for ocean freight and insurance to the Japanese steel values. See Timken's Opp'n. at 37-38.

   C.   **Analysis**

   Commerce added ocean freight and insurance expenses from Japan to the United States to the Japanese export values in order to determine usable values for India. See Timken's App. Tab 15 (referencing Issues & Decision Mem.). Commerce made this adjustment because it lacked information on such costs from Japan to India, and found that the data to the United States was the "best available information." Id. CMC argues that this adjustment was inconsistent with Commerce's past practice. However, the record of the eleventh administrative review does not indicate that this precise issue was raised or that there was evidence of freight and insurance costs that Commerce could have used or actually rejected. See Final Results of 1997-1998 Antidumping Duty Administrative Review and Final Results of New Shipper Review on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 64 Fed. Reg. 61,837, 61,839-40.

The Court agrees with Commerce.  Although CMC complains that the ocean freight and insurance expenses relied upon were not accurate, CMC points to no other information on the record that Commerce could have used or that Commerce rejected.  The Court finds that Commerce properly included the cost of freight and insurance to get the steel from Japan to India.  Moreover, the Court rejects Luoyang's argument that the record does not reflect any attempt by Commerce to closely approximate the distance between Japan and India, and draws Luoyang's attention to the Issues and Decision Memo where Commerce explained that "[o]f the available freight cost data on the record, the PRC to [United States] West coast data most closely approximates the shipping distance between Japan and India."  Timken's App. at Tab. 15 p. 25.

**V.   Commerce Properly Rejected ZMC's Input Value for Steel Bought From a PRC Supplier and Paid For With PRC Currency**

**A.   Contentions of the Parties**

ZMC argues that Commerce departed from past practice and used surrogate values for the steel used by ZMC's factory as opposed to the actual price paid for the steel in United States currency.  See Luoyang's Mot. at 20.  According to ZMC, "[t]here is no evidence on the record to show that the prices paid by ZMC's factory . . . were aberrational. . .  Commerce completely disregarded the possibility that the actual steel price data might in fact constitute the best

available information that would lead to the most accurate margin calculation." Id. at 21.

ZMC adds that Commerce's regulations "do not limit the use of import prices to imports made by the manufacturer only." Id. at 22. As a result, Commerce is free to use import prices paid by trading companies as surrogate values so long as such prices constitute the "best available information." Id. at 23. Therefore, the question becomes whether "it is reasonable for Commerce to ignore what is purportedly the best information available when it employs a[n] NME factors of production analysis." Id. (citation omitted). ZMC maintains that the answer to the question is no. "'Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable.'" Id. (citation omitted) (emphasis in original). ZMC maintains that although Commerce had adequate data reflecting actual prices paid, Commerce rejected this data and used surrogate value. ZMC contends that this practice was illogical and that "[t]his methodology cannot possibly be characterized as one based on the 'best available information.'" Id. at 24.

Commerce argues that this case is distinguishable because it involves a sale in a market that is defined by statute as not reflecting the fair value of merchandise. See Commerce's Mem. at

63. Commerce further argues that the very "fact that the PRC seller obtained the input in a market economy currency from a market economy producer does not negate the fact that the next transaction, the sale to ZMC's factory considered by Commerce, occurred wholly within a[n NME]." Id. Timken generally agrees with Commerce and adds that the Court cannot substitute its judgment for that of the agency. See Timken's Opp'n at 53-55.

B.   Analysis

The Court agrees with Commerce that by definition, ZMC's purchase price of steel from a PRC supplier in PRC currency is unreliable. The Court in Olympia, 22 CIT at 390-92, 7 F. Supp. at 1001, held that Commerce's conclusion that "[p]rices paid by trading companies do not represent prices paid by manufacturers" failed to explain why trading company data is never reliable for the purpose of FOP analysis. In Olympia, the rejected data consisted of market-based prices paid by PRC trading companies to suppliers in market economies. See id. The facts of this review differ in that the price paid by ZMC's factory, a PRC producer, was in PRC currency and was remitted to another PRC producer. See Luoyang's Mot. at 7-8 (stating that the steel was purchased and imported by a certain producer and later purchased by ZMC's factory in PRC currency).

Section 1677(18) of Title 19 of the United States Code defines

an NME as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18) (emphasis added). The transaction at issue involves a sale in an NME, and this fact is not negated by ZMC's argument that the PRC seller obtained the input by using a market economy currency. Commerce explained in ZMC's verification report its reasons for rejecting this value. Commerce's Mem. at App. p. 8.; see also 19 C.F.R. § 351.408(c)(1) (stating that "[f]or purposes of valuing the factors of production, . . . where a portion of the factor is purchased from a market economy supplier and the remainder for a[n NME] supplier, [Commerce] normally will value the factor using the price paid to the market economy supplier.") Essentially, the sale occurred in a market that is defined, by statute, as not reflecting the fair value of merchandise. The whole transaction, therefore, was tainted and without evidence showing that the actual prices paid reflected fair market prices, Commerce reasonably disregarded ZMC's steel input and used surrogate values.

**VI. Commerce Properly Disregarded Actual Ocean Freight Charges Paid in Market Economy Currency to PRC Freight Forwarders**

   **A. Background**

In the present review, Wafangdian paid its shipping charges to

a PRC freight forwarder.  Commerce found, however, that the record evidence does not link the amount Wafangdian claims to have paid for these services to the amount charged by the market economy supplier.  See CMC's Mem. at App. 8 p. 22.  As a result of this finding, Commerce used surrogate values to calculate the ocean freight charges Wafangdian incurred using a PRC freight forwarder. See id.

### B.    Contentions of the Parties

Luoyang, Wafangdian and ZMC ("Luoyang et al.") argue that Commerce improperly disregarded ocean freight charges paid in market economy currency for shipments on market economy carriers. See Luoyang's Mem. at 29.  Luoyang et al. also contend that Commerce's rejection of Wafangdian's expenses as a result of absent documentation is erroneous since "Commerce never asked for any such documentation.  There was no evidence on the record to show that the price charged was different than that quoted in [United States] dollars."  Id. at 30. According to Luoyang et al., Commerce provided no legitimate reasoning to support why the market economy supplier would not have been paid in market economy currency or why the supplier would charge the freight forwarder a higher price. Luoyang et al. further maintain that Commerce's decision was contrary to 19 U.S.C. § 1677b(c)(1), which provides that "the valuation of the factors of production shall be based on the best

available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce.]"  Therefore, Commerce should have used the prices reported by Wafangdian and ZMC, which represented the actual prices paid for ocean freight and, accordingly, constituted the best available information.  See Luoyang's Mem. at 31.  "The underlying surrogate values used were not contemporaneous and were much less specific to the transactions involved."  Id.

Commerce asserts that the record "is entirely devoid of documentation demonstrating the actual cost of Wafangdian's ocean freight."  Commerce's Mem. at 64.  Accordingly, Commerce properly used a surrogate to value this expense.  Commerce also maintains that the surrogate value for marine insurance was directly related to the value of the TRBs at issue.  See id. at 65.  "Commerce specifically based its marine insurance upon value, consistent with this Court's holding in Peer Bearing [Company v. United States, 22 CIT 472, 495,] 12 F. Supp. 2d 445, 458  (1998)."  Commerce adds that it did not violate the statue by not using a surrogate value for steel shipped in containers.  See Commerce's Mem. at 66.

### C.    Analysis

The Court in Yantai Oriental Juice Co. v. United States, 2002 Ct. Intl. Trade LEXIS 56 *30 (CIT June 18, 2002), explains that "Commerce has [never] accepted a transaction between two nonmarket

entities as proof of the cost of ocean freight expenses." Section

351.408(c)(1) of the Code of Federal Regulations requires that an

input be (1) "purchased from a market economy supplier" and (2)

"paid for in a market economy currency." Given that Wafangdian,

ZMC and the freight forwarders do business in an NME which "does

not operate on market principles," see 19 U.S.C. § 1677(18)(A), it

hardly seems unreasonable that proof of what was paid to a market

economy supplier should be used to substantiate that the amount

paid for this factor was "determined by market forces." See

Yantai, 2002 Ct. Intl. Trade LEXIS at *29-*30. Absent such

evidence, Commerce "is justified in its use of a surrogate freight

price." Id. at 31. Therefore, Commerce's use of surrogate values

to determine ocean freight expenses is in accordance with law.


**VII. Commerce's Use of Surrogate Values for Wooden Cases and for the Steel Used to Make Rollers**

    **A.  Background**

In the Final Results, Commerce selected certain surrogate

values for wooden cases and for the steel used to make rollers and

explained its determination as follows:

> [Commerce] examined the newer, more contemporaneous data
> from India that was placed on the record of this review
> by [Luoyang, Wafangdian and ZMC] following the
> publication of the Preliminary Results. [Commerce's]
> analysis of this data indicates that the new Indian value
> is consistent with the [United States] benchmark.
>
> . . .

[Accordingly, Commerce used] this import data from India
to value the type of steel used in the manufacture of
rollers.

Regarding wooden cases, the amount derived from the
Indian import statistics is $3.46 per kilogram.  This
value is not substantially different from the rate based
on the Indian import statistics used in [the tenth
administrative review] ($2.07 per kilogram).  Since
[Commerce] ha[s] no Indonesian data to rely upon for
wooden cases, . . . for the Final Results, [Commerce]
continue[d] to value wooden cases using the Indian import
statistics.

Timken's App. at Tab 8. Cmts. 5, 10.


B.     Contentions of the Parties

1.     Luoyang, Wafangdian and ZMC's Contentions

Luoyang et al. contend that Commerce failed to evaluate the

record data when selecting a surrogate value for wooden cases and

the steel used to make rollers.  See Luoyang's Mem. at 35-39.  With

respect to the roller steel surrogate value, Commerce based its

calculation on Indian import statistics for the period of April

1998 through January 1999.  See id. at 35.  Commerce considered

values from thirteen countries, that included Russia and the PRC

(both NME).  See id.  Imports from these two were disregarded.

From the remaining eleven countries, four countries actually

produced bearing quality steel.  See id. at 35-36.  Of the

remaining four, Commerce eventually disregarded Indian imports.

See id.


Luoyang et al. complain that Commerce is under an affirmative

obligation to determine whether Indian imports were the best available information.  Moreover, in accordance with Commerce's explanation in the Issues and Decision Memo, the agency should have also excluded imports from Austria, Germany and the April through December 1998 imports from France.  See id. at 36-37.  "These prices were substantially above the others and above the upper [United States] benchmark prices.  In addition, the Indian import data showed that the imports from Austria and France (for April [through] December 1998) represented extremely small quantities." Id. at 37.  Luoyang et al., therefore, argue that Commerce should disregard these import figures since they are aberrational.

With respect to the surrogate value of the wooden cases Wafangdian used to pack some of its TRBs for shipment to the United States, Luoyang et al. contend that Commerce failed to properly evaluate the Indian import statistics.  A "cursory review of the figures shows that the values and quantities vary widely.  The shipment of four boxes from the [United Kingdom] should be disregarded because of the small quantity involved."  Id. at 39. Similarly, the value for the wooden cases in Spain is very high when compared to other values.  Luoyang et al. further maintain that "Commerce should evaluate the imports to determine which constitute the 'best available information' and should disregard those that are non-commercial shipments and those which are so high

in value that they are not likely to be used for packing alone."
Id.

### 2.   Commerce's Contentions

Commerce responds that it has discretion to select appropriate surrogate values to determine normal value based upon FOP.  See Commerce's Mem. at 66.  Commerce accepted the Indian import statistics for steel submitted by the parties.  After disregarding the NME countries, Commerce used the information without further adjustment, and acted within its discretion as articulated by the Court in Peer Bearing, 22 CIT at 495, 12 F. Supp. 2d at 458.

### 3.   Timken's Contentions

Timken argues that Luoyang et al.'s contention constitutes an "impermissible change in position."  See Timken's Opp'n at 53. Timken states that Luoyang itself submitted the data used by Commerce in an early submission to the agency. "It was only after the Final Results that Luoyang et al. took the position that Commerce 'erred' by not excluding certain portions of the data, claiming that the values were aberrations and that using them would be a 'clerical error.'"  Id. at 54.  Timken maintains that Commerce properly rejected this argument and deemed the error to be methodological, rather than clerical in nature.  See id.  Timken adds that the appropriate time has lapsed in which Luoyang et al. can raise this issue.  Finally, Timken claims that Wafangdian fails

to show that Commerce erred in valuing wooden cases and the steel used to make rollers.

### C. Analysis

As a preliminary matter, the Court addresses Timken's argument that Luoyang et al. failed to exhaust their administrative remedies. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.")[11] The purpose behind the doctrine of exhaustion is

---

[11] There is however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). Therefore, because "each exercise of judicial discretion [does] not requir[e] litigants to exhaust administrative remedies," the court is authorized to determine proper exceptions to the doctrine of exhaustion. Alhambra, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United

(continued...)

to prevent courts from premature involvement in administrative proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serv[es] four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . .; [(2)] it protects the autonomy of agency decisionmaking; [(3)] it aids judicial review by permitting factual development [of issues

---

[11](...continued)
States, 20 F.3d 1156 (Fed. Cir. 1994)).

In the past, the court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) plaintiffs had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986).

relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial factfinding and by" resolving sole claims without judicial intervention).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it. See generally, Hormel v. Helvering, 312 U.S. 552 (1941); see also Rhone Poulenc, 899 F.2d at 1191. The sole fact of an agency's failure to address plaintiff's challenge does not invoke the exhaustion doctrine and shall not result in forfeiture of plaintiff's judicial remedies. See generally, B-West Imports, Inc. v. United States, 19 CIT 303, 880 F. Supp. 853 (1995). An administrative decision not to address the issue cannot be dispositive of the question whether or not the issue was properly brought to the agency's attention. See, e.g., Allnutt v. United States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md. 2000).

In the case at bar, Luoyang et al. sufficiently provided Commerce with the opportunity to address the issue of Commerce's failure to disregard aberrational data. The Issues and Decision Memo sets forth that Luoyang et al. argued, inter alia, that: (1) "in valuing rollers used in the production of TRBs, [Commerce]

should utilize more current Indian import data which was placed on the record subsequent to the Preliminary Results;" (2) Commerce "should generally avoid using [United States] values as benchmarks, and should specifically refrain from doing so for roller steel;" and (3) "in using [United States] values as benchmarks for the purpose of factor valuation, [Commerce] risks transforming the United States into the surrogate country even though the record does not support the use of the United States as the appropriate surrogate country." See Luoyang's App. 8 at 12. The Court, therefore, concludes that Luoyang et al. properly exhausted their administrative remedies and have the right to raise this issue.

The Court is not satisfied that Commerce acted within its discretion in selecting surrogate values for wooden cases used to ship TRBs to the United States and the steel used to produce rollers. The Court recognizes that Commerce has wide discretion to determine what surrogate values constitute such "best available information," however, the record must reasonably support the agency's determination. The CAFC has reasoned that "the purpose of the statutory provisions is to determine antidumping margins 'as accurately as possible.'" Shakeproof III, 268 F.3d at 1382 (quoting Lasko, 43 F.3d at 1446); see also Olympia, 22 CIT at 390, 7 F. Supp. 2d at 1000-01 (noting that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, 899 F.2d at

1191. Although Commerce claims that its application of the surrogate values for wooden cases and the steel used to produce TRBs reflects this administrative goal, the approach followed by Commerce, in this instance, relieves the agency of this very responsibility. Commerce has failed to explain to this Court why the surrogate values it chose constitute the "best available information," and to address the aberrational record data that Luoyang et al. point to. Thus, this issue is remanded to Commerce for further explanation.


**VIII.    Commerce's Decision Not to Apply the "PRC RATE" to All Premier United States Sales**


   **A.    Background**

During the POR, Premier was a privately owned Hong Kong reseller of the subject merchandise. See Mem. Supp. Timken's Mot. J. Upon Agency R. ("Timken's Mem.") at 6. Premier resold the subject Chinese TRBs to seventeen unaffiliated Chinese suppliers. When this review was commenced, Commerce sent Premier its standard antidumping questionnaire requesting, inter alia, information regarding FOP, which "required Premier to obtain responsive data from its suppliers." Id. Only three of the seventeen suppliers provided Premier with any information, which was ultimately found to be inadequate due to incomplete accompanying explanations. See id. Commerce later sent FOP questionnaires "directly to the

suppliers themselves, specifically requesting the needed information," id. at 7, but this effort yielded no new information.

During the subject review, Timken argued that Commerce should, as a matter of law, apply the so-called "PRC Rate," which was 33.18 percent, to all Premier United States sales. See Amended Final Results, 66 Fed. Reg. at 11,563. The PRC Rate applies to goods produced by any Chinese producer who has never established an independent rate in a prior administrative review. Commerce, ultimately employed two methods for determining Premier's NV. Timken's Mem. at 7. "[W]hen the record contained Section D data submitted by another Chinese producer for a particular TRB model—i.e., data of a non-Premier supplier relevant to a common model—Commerce borrowed that information and used it for Premier's 'normal value,' treating it as non-adverse 'facts available.'" Id. at 7-8. If the record lacked such data, Commerce applied a rate of 25.56 percent for Premier, which was the rate determined in the eleventh administrative review.

In the Issues and Decision Memo, Commerce explained:

The essence of [Timken's] argument is that a state controlled producer might sell to a PRC trading company at artificially low prices, thereby allowing the latter to resell to the United States at unfair prices without the discipline of the dumping order. [Timken's] fear is unfounded, however. If the PRC trading company reselling the supplier's TRBs in the United States had a separate rate, we would compare its [United States] prices to

normal value based on the supplier's FOP data, and determine a dumping margin as appropriate. If the trading company did not have a separate rate, then its sales to the United States would be subject to the PRC-wide rate. Either way, the TRBs produced by the supplier and resold through the trading company are subject to the discipline of the dumping order. Any "unfair" prices would be offset by the appropriate amount of the antidumping duty.

App. Timken's Mem. at Tab 18 p. 28. Commerce further stated that Premier's suppliers were unaware of the ultimate destination of the goods they sold, and based this finding on Premier's questionnaire responses. See id. Tab 18 p. 43.

## B.    Contentions of the Parties

### 1.    Timken's Contentions

Timken argues that "a rebuttable presumption [exists] that all producers in a given [NME] country are parts of a single nonmarket entity—[in this instance,] the 'PRC entity.'" Timken's Mem. at 25. Timken asserts that the only way a producer can avoid this single country rate is to provide Commerce with sufficient evidence to show an "absence of governmental control. . . . The successful showing establishes the producer as an exception to the general rule." Id. (emphasis omitted). In this instance, Premier's seventeen suppliers have never affirmatively showed that they are not under governmental control. See id. at 26. "Therefore, Commerce acted contrary to law by assigning, to [Premier's] goods, anything other than the PRC Rate." Id.

Timken next argues that the subject suppliers' "outright refusal" to provide information should have resulted in Commerce's drawing of adverse facts available. See id. at 26-27. Timken explains that "[o]nce a respondent refuses to respond to a questionnaire or does not supply Commerce with an adequate explanation for refusing to respond, Commerce no longer focuses on calculating the 'true' margin but instead must focus on determining an adverse margin that will induce cooperation in the future." Id. at 27 (quotation omitted).

Timken further contends that Commerce's explanation that it followed past agency practice is inconsistent "with the statute's focus on determining values based on actual [FOP] consumed in producing subject merchandise and on the basic methodological presumptions underlying nonmarket calculations." Id. at 31. The statute requires that Commerce determine nonmarket NV on the basis of the FOP consumed in producing the subject merchandise. See id. This determination is independent of who actually exports the goods. See id. Timken, therefore, asserts that Commerce acted contrary to law since the basic nonmarket methodology and statute require Commerce to apply the country-wide PRC rate to all of Premier's United States sales.

### 2.   Commerce's Contention

Commerce responds that this Court "has repeatedly sustained Commerce's authority to establish a rate for a non-producing PRC trading company separate from its PRC producer."  Commerce's Mem. at 23.  Commerce engages in a separate rates analysis to determine whether the subject exporter is an independent market participant as opposed to an entity "closely tied to" a communist government. See id.  According to Commerce, "[t]his principle is in stark opposition to that offered by Timken, that is, that the focus of Commerce's separate rates analysis must always be on the specific entity that actually produced the subject merchandise."  Id. (citation omitted) (emphasis in original).

Commerce claims that the refusal of Premier's suppliers to fully answer the questionnaires "does not [by itself] negate Commerce's correct finding that Premier was entitled to a separate rate."  Id. at 24.  Moreover, the cases Timken relied upon for its argument actually support Commerce's application of a separate rate to Premier's United States sales.  See id.  Both cases held "that it is entirely proper for Commerce to establish separate rates for a PRC exporter, that is not necessarily the producer of the merchandise."  Id. at 24-25.  Commerce explains that it did not apply its separate rates analysis to Premier because it is a privately owned entity that fully participated in the review.  See

id. at 25. "As there is no state ownership and there was full participation, there was no need to do a separate rates . . . to determine whether Premier was free from government control." Id. at 25-26. Commerce adds that this position was consistent with its two prior reviews. See id. (citing Preliminary Results of 1997-1998 Antidumping Duty Administrative Review and Partial Recission of Antidumping Duty Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 64 Fed. Reg. 36,853 (July 8, 1999); Preliminary Results of 1996-1997 Antidumping Duty Administrative Review and New Shipper Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 63 Fed. Reg. 37,339 (July 10, 1998)).

Commerce also contends that Timken fails to point to any practice or precedent that "compels this Court to disturb Commerce's determination as to whether Premier was the proper respondent for [this] review." Id. at 26. Commerce claims that the PRC suppliers were not responsible for setting United States sales prices for Premier. See id. Furthermore, even if Premier's suppliers were not entitled to a separate rate, such does not disqualify Premier from receiving its own rate for domestic sales. See id.

Commerce rejects Timken's argument that the agency was

required to apply adverse inferences and the PRC rate to the margins for those TRBs supplied to and resold by Premier to the United States. See id. at 27. Adverse inferences are applied to parties and not to the subject merchandise. Therefore, the statute does not "impute an adverse inference to an exporter merely because its supplier refuses to cooperate with Commerce's requests for information." Id. (citing 19 U.S.C. § 1677e(b)).

Commerce also explains why Premier was the proper respondent in this review. Commerce states:

> If record evidence had demonstrated that a supplier(s) knew the [United States] destination of its TRBs, then such supplier(s) may have been the entity that set the [United States] price and, therefore, it would have been more appropriate for Commerce to determine whether that supplier(s) was entitled to a separate rate for purposes of determining an accurate margin. As set out by Commerce in the [Issues and] Decision Memo,] however, the only record evidence concerning this issue is Premier's un-rebutted denial that its suppliers had any knowledge of the destination of the TRBs sold to Premier. Based upon this evidence, Commerce properly determined that Premier was the correct entity to consider for review.

Id. at 28-29 (citation omitted). Finally, Commerce asserts that all of Premier's statements on the record are not contradicted by any other record evidence and that Commerce's determination to apply a separate rate was consistent with the agency's past practice and in accordance with law. See id. at 29.

### C. Analysis

It is Commerce's practice to allow individual exporters in an

NME to receive separate, company-specific rates upon a showing that they operate independent of government control.  See Final Results and Partial Rescission of Antidumping Duty Administrative Review of Manganese Metal From the People's Republic of China, 63 Fed. Reg. 12,440, 12,441 (Mar. 13, 1998).  A presumption of government control exists, however, it can be rebutted with specific evidence showing, inter alia, that the exporter: (1) sets its own prices; (2) keeps the proceeds from its sales; (3) has authority to negotiate on its behalf; and (4) is autonomous of government decisions regarding management.  See Coalition for Pres. Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT at 88, 101, 44 F. Supp. 2d 229, 243 (1999).  Commerce has stated that once a Chinese exporter demonstrates its autonomy and entitlement to a separate rate, "it is not necessary for that company to resubmit data supporting a separate rate."  Final Results of Antidumping Duty Administrative Review of Certain Iron Construction Castings From the People's Republic of China, 57 Fed. Reg. 24,245, 24,246 (June 8, 1992).

Some of Premier's sales did receive a non-PRC rate even though Commerce did not conduct a separate rates analysis for the company. Commerce argues that since Premier was a privately owned entity that fully participated in the review, "there is no state ownership . . . [and] no need to do a separate rates analysis."  Commerce's

Mem. at 25-26. Timken does not dispute Premier's independence, but rather contends that Commerce was required to conduct the separate rates analysis. The Court agrees with Timken.

Fujian Machinery and Equipment Import and Export Corporation v. United States, explains that "the essence of a separate rates analysis is to determine whether the exporter is an autonomous market participant, or whether instead it is so closely tied to the communist government as to be shielded from the vagaries of the free market." 25 CIT ___, ___, 178 F. Supp. 2d 1305, 1331 (2001). Premier has not established such independence; to the contrary, Premier's Chinese suppliers failed to reply to Commerce's questionnaires in this review. The Court recognizes that such supplier's are not interested parties in this review.[12] However, the suppliers' refusal to submit information prevented Commerce from determining whether state-controlled producers sold materials to Premier at state-controlled prices, thus causing Premier to

---

[12] Accordingly, this Court finds Timken's arguments regarding the application of adverse facts available to Premier are without merit. Premier fully participated in the review, and has no control over it's suppliers cooperation. Section 1677e(b) of Title 19 states that when Commerce finds "that an interested party failed to cooperate . . . [the agency] may use an" adverse inference. Premier's suppliers are not interested parties. Therefore, the Court will not apply adverse facts to Premier as a result of its suppliers' deficiencies. See generally Kompass Food Trading Int'l v. United States, 24 CIT 678, 682-83 (2000) (holding that once a respondent refuses to supply information, Commerce no longer focuses on the "true" margin but rather on determining an adverse margin that will induce future cooperation).

resell products to the United States at unfair prices, albeit unknowingly.  If such was the case, Premier would not be entitled to an NME rate.

The CAFC has stated that "[t]he antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources."  Sigma Corp. v. United States, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).  Accordingly, Commerce established the rebuttable presumption that control exists absent a contrary finding.  Such requires an affirmative demonstration and a specific finding on point.  See Coalition, 23 CIT at 101-103, 44 F. Supp. 2d at 243-46.  Commerce based its finding of Premier's independence on a statement made by Premier during the review that "its suppliers had [no] knowledge of the destination of the TRBs [they] sold to Premier."  Commerce's Mem. at 29.  The veracity of this statement, however, is irrelevant.  Commerce acted contrary to its responsibility, as articulated by Coalition, and its finding is not supported by substantial evidence since Commerce failed to conduct the very analysis that would have produced the relevant evidence to support its determination.  Thus, this issue is remanded to Commerce to conduct the separate rates analysis, and apply the PRC rate to all of Premier's United States sales if it finds that Premier is not autonomous.

IX.  **Commerce's Use of Other Producers' Factors Data to Calculate Premier's NV**

A.    **Contentions of the Parties**

1.    **Timken's Contentions**

Timken contends that even if Commerce properly determined not to apply the PRC rate to Premiers' suppliers, Commerce should have applied the Premier "facts available" rate of 25.56 percent to all reported Premier sales, as opposed to only a limited number of sales.  See Timken's Mem. at 32.  Timken claims that the record does not support a finding that Premier acted to the best of its ability to obtain FOP information.  See id.  Timken cites to confidential evidence in the record to support its claim that "a reasonable mind could only conclude that Premier took only perfunctory steps."  Id. at 34.

Timken also argues that Commerce's reasons for excusing Premier's non-compliance failed the substantial evidence test.  See id. at 35-36.  Moreover, Timken asserts that "[b]y resolving all doubts in Premier's favor and speculating on Premier's behalf, Commerce inappropriately gave priority to that company's interests at the expense of [United States] producers."  Id. at 36.  Timken further argues that placing Premier's interests above every other interested party goes contrary to the remedial nature of the antidumping statute.  See id.  In sum, Timken states that Commerce's determination was not supported by substantial record

evidence and Commerce failed to provide adequate reasons for excusing Premier's deficient response.  See id. at 38-40.

### 2.    Commerce's Contentions

Commerce responds that the record evidence actually supports the agency's decision in this review.  See Commerce's Mem. at 30. Commerce explains:

> In its original questionnaire, Commerce asked Premier for its list of suppliers, which Premier supplied.  Commerce also asked whether Premier's suppliers knew the ultimate destination of the TRBs sold to Premier would be the United States.
> In its October 15, 1999 response, Premier answered that its suppliers did not know the ultimate destination, that Premier's suppliers did not have access to Premier's sales records and that Premier's suppliers did not participate in any sales activities related to the United States.
> Commerce next asked Premier to describe the production process of its suppliers.  Premier responded on November 5, 1999, by providing to Commerce the list of its suppliers and stated that its suppliers compete with Premier and have been reluctant to provide such information in the past.  Further, Premier stated that it was trying to obtain the FOP from its suppliers and provided a sample letter that was sent to each of its suppliers.  Finally, Premier stated it would attempt to obtain FOP information from other PRC producers that were participating in the review, which FOP information would apply to models sold by Premier during the period of review. . . .
> Commerce next asked Premier to provide the FOP information Premier had received "at this time," meaning the April 2000 deadline for that particular Commerce supplemental questionnaire.  On April 6, 2000, Premier provided Commerce FOP information for three suppliers and stated that a fourth supplier (this one participating in the review) had authorized Premier to use its FOP data. This response was consistent with Premier's prior statement that FOP information was difficult to get from competing suppliers and also consistent with Premier's

> attempt to get FOP information from other participating
> respondents in the review. . . .
>       In its next response, Premier told Commerce it was
> translating the aforementioned FOP information. Shortly
> thereafter, on May 25, 2000 Premier provided translated
> FOP information, as requested by Commerce.
>       Premier timely answered Commerce's questions,
> providing a completely reasonable explanation as to why
> it might not be able to obtain suppler FOP information--
> it competes with them. Premier provided documentation of
> its attempted request for FOP information from its
> competing suppliers. Premier timely provided to Commerce
> the information it did receive from some of its
> suppliers.

Commerce's Mem. at 30-32 (citations omitted). Commerce contends

that its decision was not based on speculation, but rather on the

record evidence. See id. at 32. Commerce continues that even if

the record evidence may lead Commerce to two inconsistent

conclusions, "this does not mean that Commerce's findings are not

supported by substantial evidence." Id. (citation omitted). Thus,

Commerce's inferences regarding Premier, even if inconsistent with

Timken's conclusion, "are permissible based upon this record." Id.

at 33.

     Commerce also raised issue with Timken's contention that

Commerce's determination was inappropriate under Chevron. Commerce

argues that "the cases cited by Timken stand for the general

proposition that exemptions from the antidumping statute are to be

construed narrowly, given the statute's remedial purpose." Id.

Accordingly, Commerce made reasonable inferences regarding

Premier's effort to obtain FOP data. Commerce also asserts that Timken's arguments regarding its factor utilization rate methodology was at best an alternative methodology. See id. at 34.


### C. Analysis

The Court has remanded the issue of whether Commerce properly applied separate rates to Premier's United States sales. Therefore, the Court will not address the issue of whether Commerce should have applied the Premier "facts available" rate of 25.56 percent to all reported Premier sales until it receives the remand results.


### X. Commerce's Addition of Wafangdian's Post Sale Price Adjustment to United States Price

### A. Background

In the Preliminary Results, Commerce did not make an adjustment for Wafangdian's claimed credit in its calculation of Wafangdian's net export price. See Preliminary Results, 65 Fed. Reg. at 41,944. On July 11, 2000, Wafangdian claimed that this was a clerical error and urged Commerce to add the credit to the United States' selling price before calculating export price. See App. Timken's Mem. at Tab 14. Commerce eventually accepted Wafangdian's credit as a post sale price adjustment ("PSPA") on the subject merchandise, ultimately increasing United States price, because the

credit was not reasonably attributable to subject merchandise but rather to non-subject merchandise.

### B. Contentions of the Parties

Timken argues that a reasonable mind would not have accepted the adjustment submitted by Wafangdian because it was not tied to specific transactions to which the PSPA was applied. See Timken's Mem. at 40-43. Accordingly, Commerce's allowance of the subject PSPA is unsupported by substantial evidence and yielded distorted results. See id. at 43. Timken proclaims that "there must be a 'rational connection between the facts found and the choice made' for the Court to sustain Commerce's determination." Id. at 44 (referencing confidential information).

Commerce claims that it properly accepted the PSPA because the record demonstrates that the adjustment was accurately reported and, therefore, the agency's increase to the United States price was in accordance with law. See Commerce's Mem. at 35. Commerce also contends that Commerce's determination focused on calculating an accurate buyer's net outlay for the subject merchandise. "Commerce properly did this by not attributing the credit to the cost of the subject merchandise." Id. at 38.

Wafangdian generally agrees with Commerce and argues that the PSPA accepted by Commerce was "factually supported and fully

consistent with the pertinent" regulations. See Mem. Wafangdian Opp'n Mot. J. Agency R. Timken ("Wafangian's Mem.") at 8. The relevant regulation "places the burden on the 'interested party that is in possession of the relevant information' of 'establishing to the satisfaction of [Commerce] the amount and nature of a particular adjustment.'" Id. (quoting 19 C.F.R. § 351.401(b)). Wafangdian claims that it met this burden and that Timken's argument is based on the assumption that "price adjustments should be like expenses and the price net of the expense should be lower." Id. at 10. Wafangdian, however, explains that the net price is exclusive of the price adjustment, and is ultimately higher than the gross price which includes PSPA. See id.

Wafangdian also claims that it provided Commerce with proper documentation verifying that the allocation was made on a "transaction specific basis." See id. Wafangdian further asserts that the price adjustments were made without regard to the "question of dumping duties," and that Commerce has consistently made adjustments for PSPA in the past. See id. (citing Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada, 64 Fed. Reg. 2,173 (Jan. 13, 1999); Final Results of Antidumping Duty Administrative Reviews on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania,

_Singapore, Sweden and the United Kingdom_, 62 Fed. Reg. 54,043 (Oct. 17, 1997)).

### C.   Analysis

Price adjustments, as defined in 19 C.F.R. § 351.102, reflect any change in the price charged for subject merchandise or the foreign like product.  Examples of price adjustments include, _inter alia_, discounts, rebates and PSPA that are reflected in the purchaser's net outlay.  _See_ _id._  To calculate export price, Commerce will use a price, net of any price adjustment, that is reasonably attributable to the subject merchandise or the foreign like product.   _See_ 19 C.F.R. § 351.401(c).   The purpose of such price adjustments is to "describe a category of changes to a price . . . . that affect the net outlay of funds by the purchaser. . . . [S]uch price changes are not 'expenses' [as normally described by Commerce] but rather are changes that [Commerce] must take into account in identifying the actual starting price."  _Antidumping Duties; Countervailing Duties_, 62 Fed. Reg. 27,296, 27,300 (May 19, 1997).

During the POR, Wafangdian ("seller") and its domestic customer ("United States" or "buyer") agreed that "the seller had sold the buyer some defective non-subject merchandise and that the seller owed buyer a sum certain in compensation."  Commerce's Mem. at 35 (citing App. Timken's Mem. at Tab 26).   A compensation

agreement was entered into between Wafangdian and the buyer, which was presented to Commerce in Wafangdian's amended questionnaire response.  See id. at 36.  Wafangdian presented the agreed upon compensation as a "credit" to those certain United States sales and reported the same gross unit price for the certain sales in its original and amended United States sales report.  See id.  The credit in the amended United States sales report had the effect of reducing the price to the buyer for certain United States sales by the amount that the seller agreed to compensate the buyer for the defective non-subject merchandise.  See id. (citing Issues & Decision Mem. at 40).

Although Commerce did not include the PSPA in the Preliminary Results calculation, Commerce received information by Wafangdian supporting its argument that it was entitled to an adjustment. See App. Timken's Mem. at Tab 14.  The credit was added as a PSPA "in order to reflect the actual amount paid by the buyer because the credit, while owed to the buyer, was not reasonably attributable to the subject merchandise."  See Commerce's Mem. at 37; see also 19 C.F.R. § 351.102(b).  Commerce has asserted its authority to make direct adjustments to any price that is reflected in the buyer's outlay.  See 19 C.F.R. § 351.401(a)-(c) (stating that in "calculati[ng] export price, constructed export price, and normal value . . . [Commerce] will use a price that is net of any price

adjustment"). In this review, Commerce made a direct adjustment "to twice reported identical gross price, based upon [Wafangdian's] reporting of a credit on that price that was not related to the subject merchandise." Commerce's Mem. at 37; see 19 C.F.R. § 351.401(b)(2) (stating that Commerce "will not double count adjustments"). Commerce acted reasonably because the record evidence clearly demonstrated a valid reason for the PSPA, and Commerce verified the existence and amount of the debt owed by Wafangdian. See App. Timken's Mem. Tab 14. Thus, Commerce is affirmed.

## XI. Commerce's Refusal to Make Adjustments to Wafangdian's NV to Account for the Production of Defective (or Non-Specification) Parts

### A. Contentions of the Parties

Timken argues that it was Commerce's "duty" to investigate whether Wafangdian generated defective parts when producing subject merchandise. See Timken's Mem. at 45-46. Timken recognizes that it was Wafangdian's burden to "provide relevant quantities information and then to demonstrate the appropriateness of offsets [requested] . . . for any sold or reworked parts." Id. at 47. However, Timken contends that Commerce erred in not pursuing "key facts and essentially [by giving] Wafangdian the benefit of the doubt." Id. Since the substantial evidence rule applies,

"Wafangdian's deficient reporting of <u>all</u> factors of production consumed in producing defective parts" caused Commerce to arrive at a defective NV calculation. <u>See</u> <u>id.</u> (citations omitted) (emphasis in original).

Commerce argues that it "specifically asked Wafangdian to 'demonstrate how the reported figures for scrap and waste account for parts that do not meet appropriate specifications (defective parts).'" Commerce's Mem. at 39. Commerce adds that Wafangdian gave specific information relating to how the company arrived at the percentage of steel that it used in non-specification production. <u>See</u> <u>id.</u> According to Wafangdian, Commerce was aware of the percentage of steel that was used to produce defective parts, and that some of those defective parts were re-worked into subject merchandise. <u>See</u> <u>id.</u> at 40. To adjust NV accurately, therefore, Commerce requested additional information about production and sales of those non-specification parts. <u>See</u> <u>id.</u> Since Wafangdian did not provide the requested information Commerce chose "not to apply the percentage of steel used in the production of defective parts." <u>Id.</u> at 41. Wafangdian generally agrees with the arguments made by Commerce.

### B. Analysis

Timken's claim is without merit. During this review, Commerce specifically investigated how much material was used in the

production of defective parts but received incomplete information from Wafangdian. See Commerce's Mem. at 40; App. Timken's Mem. at Tab 18. As a result, Commerce chose not to apply the percentage of steel used in the production of defective parts. Timken claims that Commerce's investigation was inadequate and that the agency erred in not pursuing certain "key facts." The Court disagrees. The record clearly demonstrates that Commerce requested Wafangdian to show "how the reported figures for scrap and waste account for parts that do not meet appropriate specifications." App. Timken's Mem. at Tab 15 p. 7. In Wafangdian's report, the company detailed how it arrived at the reported percentage of steel used in defective products and provided backup worksheets. See id. Thus, Commerce properly refused to adjust Wafangdian's NV calculation because the record did not support an adjustment for defective, or non-specification parts.

## XII. Commerce Properly Revoked the Antidumping Order With Respect to Wafangdian

To qualify for partial revocation, a party must show three years of zero or de minimis dumping margins. See 19 C.F.R. § 351.222(b)(2)(i). In this review, Commerce revoked the antidumping duty order with respect to Wafangdian because it calculated a zero margin and applied the revocation conditions. Timken contends that revocation was arbitrary because "[l]ess than a year before the

subject revocation . . . Commerce published its five-year 'sunset'
determination in [<u>Final Results of Full Sunset Review on Tapered
Roller Bearings From the People's Republic of China</u>, 65 Fed. Reg.
11,550, 11,551 (Mar. 30, 2000) and] . . . determined that
revocation of the China TRB Order 'would be likely to lead to
continuation or recurrence of dumping.'" Timken's Mem. at 48-49.
Timken argues that Commerce's attempt to rationalize this conflict
was weak.  <u>See</u> <u>id.</u> at 49-50.

Commerce may depart from its earlier determinations and its
own prior precedent, "however, [Commerce's reasoning] must be
clearly set forth [in the record] so that the reviewing court may
understand the basis of the agency's action and so may judge the
consistency of that action with the agency's mandate." <u>Atchison,
Topeka & Sante Fe Railwav. Co v. Wichita Bd. of Trade</u>, 412 U.S.
800, 808 (1973).  Commerce explained that, <u>inter alia</u>, "a sunset .
. . review examines (a) the weighted-average dumping margins
determined in an investigation and in subsequent reviews, and (b)
the volume of imports of the subject merchandise for the period
before and the period after the issuance of an antidumping order."
App. Timken's Mem. at Tab 21 p. 6 n.5.  By contrast, under the
revocation procedure, Commerce examines company specific dumping
margins for a period of three years.  In the prior sunset review
Commerce, therefore, examined Wafangdian's sales in a different

time context.     Thus,  the  Court  finds  Commerce's  explanation
reasonable and affirms its determination to revoke the antidumping
order regarding Wafangdian.


**XIII.     Other Issues**

        The Court has considered plaintiffs' other challenges to the
Final Results, but finds them unpersuasive.   Commerce is affirmed
on all remaining issues.




                                          __/s/ Nicholas Tsoucalas__
                                            NICHOLAS TSOUCALAS
                                            SENIOR JUDGE


Dated:     May 18, 2004
           New York, New York